UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br> 450 5th St., NW <br> Washington, DC 20549 <br>           Plaintiff, <br> <br> v. <br> <br> UMESH MALHOTRA, <br> PAUL CHOPRA, and <br> DAVID MANIGAULT, <br>           Defendants. | **COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY**

1. From 1996 through 1998, COHR, Inc. ("COHR"), a former public company that provided services to hospital and clinics, defrauded investors by improperly recognizing revenue in violation of generally accepted accounting principles ("GAAP") and by engaging in other accounting tricks that fraudulently inflated COHR's revenue and pre-tax profit. The purpose of the fraud was to portray COHR as a growing and successful company when in fact it was a struggling company that by 1998 was losing money. The fraud was carried out by COHR's senior management at the time, Umesh Malhotra ("Malhotra"), its former Chief Financial Officer, Paul Chopra ("Chopra"), its former Chief Executive Officer, and David Manigault ("Manigault"), its former Chief Information Officer and Senior Vice President.

2. In March 1998, COHR filed an amended 1997 Form 10-K and amended Form 10-Q's for the first two quarters of fiscal 1998 that disclosed a massive restatement of its financial statements. These filings disclosed that COHR's pre-tax income had been improperly inflated by over 50 percent in fiscal 1997 and by over 100 percent in each of the first two quarters of

1998.  By engaging in this fraud, COHR falsely reported in 1998 that it was a profitable company, when in fact COHR incurred a loss in each of the first two quarters of 1998.

3. By their actions, Malhotra, Chopra, and Manigault violated the antifraud and reporting provisions of the federal securities laws.  The Commission requests that Malhotra, Chopra, and Manigault be enjoined from future violations of the federal securities laws as alleged herein, pay penalties, and disgorge all ill-gotten gains.  The Commission also requests that Malhotra be prohibited from acting as an officer or a director of any issuer that has a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

4. The defendants, directly and indirectly, have engaged in, and unless restrained and enjoined by this Court will continue to engage in, transactions, acts, practices, and courses of business that violate Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2] thereunder, and that aid and abet violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] thereunder.

## JURISDICTION

5. This Court has jurisdiction over this action under Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

## DEFENDANTS

6. Umesh Malhotra, age 43, served as COHR's Chief Financial Officer and assistant

secretary from 1995 through 1998 and Treasurer of the company from 1996 to 1998. From 1991 to 1995, he served as the company's Controller and Vice President of Finance. Malhotra was a Chartered Accountant in England and Wales from 1984 through 1998. Malhotra was placed on paid leave by COHR in January of 1998 and ceased employment with COHR on February 20, 1998. He currently owns a Subway franchise.

7. Paul Chopra, age 54, was COHR's CEO from 1993 to 1997, Chairman of the Board from 1996 to 1997, and a director from 1984 to 1998. From 1983 to 1987, he was the controller for COHR's former parent, Hospital Association of Southern California ("HASC"). Chopra is a Certified Management Accountant (CMA) in Canada. He is currently unemployed.

8. David Manigault, age 43, served as Executive Vice President of COHR from November 1995, its Chief Information Officer from 1984, and its Secretary from November 1996. He resigned from COHR on October 7, 1998. From March 1999 to the present, Manigault has owned his own software business, Manigault & Associates, LLC.

### FIRST CLAIM FOR RELIEF

#### Violations of Exchange Act
#### Section 10(b) and Rule 10b-5

9. Paragraphs 1 through 8 above are realleged and incorporated by reference herein.

#### Background of COHR and the Restatement

10. COHR became a public company in 1996 when it was spun off from HASC. It purchased and serviced medical equipment for hospitals and clinics nationwide, and it also provided security services and consulting.

11. In December 1997, COHR's Board of Directors commenced a review of COHR's financial records. This review led to the March 1998 restatement of COHR's financial

3

statements for fiscal 1997 and for the first two quarters of fiscal 1998. In 1999, COHR came under new ownership and terminated the registration of its stock with NASDAQ. COHR is now a private company.

12. The effect of COHR's restatement is shown in the tables below:

### FORM 10-K (FISCAL 1997)

|  | As Originally Reported ('000s) | Restated ('000s) | Difference |
|---|---|---|---|
| **Revenue** | $90,524 | $86,221 | **5%** |
| **Pre-tax income** | $8,033 | $3,920 | **51%** |
| **Net income** | $8,033 | $3,920 | **51%** |
| **EPS** | 0.88 | 0.42 | **52%** |

### FORM 10-Q (FIRST QUARTER 1998)

|  | As Originally Reported ('000s) | Restated ('000s) | Difference |
|---|---|---|---|
| **Revenue** | $26,411 | $24,811 | **6%** |
| **Pre-tax income** | $2,673 | ($559) | **121%** |
| **Net income** | $1,584 | ($355) | **122%** |
| **EPS** | 0.24 | (0.06) | **125%** |

### FORM 10-Q (SECOND QUARTER 1998)

|  | As Originally Reported ('000s) | Restated ('000s) | Difference |
|---|---|---|---|
| **Revenue** | $25,591 | $25,964 | **1%** |
| **Pre-tax income** | $2,086 | ($591) | **128%** |
| **Net income** | $1,268 | ($399) | **131%** |
| **EPS** | 0.19 | (0.06) | **132%** |

### VIOLATIONS BY MALHOTRA

### Malhotra Creates Fictitious Revenue At COHR

13. In fiscal 1997, COHR provided administrative services, such as bookkeeping, to HASC, its former parent company. Malhotra directed a staff accountant to make multiple

4

journal entries at both COHR and HASC totaling $377,000 for revenue allegedly earned by COHR for services performed by COHR for HASC. Malhotra was able to direct these entries at HASC because he was also the CFO for HASC at this time.

14. To further the fraud, Malhotra authorized the transfer of money from HASC to COHR and approved matching journal entries in HASC's books. There are no supporting documents or other indication, however, that COHR provided any of these services to HASC. The entries were made at the end of fiscal quarters in 1997 and in suspiciously round numbers. Although there was no apparent basis for COHR to bill HASC, to record these receivables, or to record the corresponding revenue, HASC did pay COHR for these purported services. At Malhotra's direction, HASC transferred money to COHR and Malhotra approved matching journal entries in HASC's books. The effect of these entries was to improperly increase COHR's revenue in fiscal 1997 by 0.4 percent and its pre-tax income by five percent. Ultimately, COHR returned the $377,000 to HASC.

### Unsupported Purchase Connection Entries

15. Malhotra also directed the entry of several unsupported journal entries in COHR's Purchase Connection division. This division purchased medical supplies at a reduced rate from manufacturers on behalf of COHR's customers and shared with the customer a portion of the cost saving in the form of a rebate. In fiscal 1997 and the first two fiscal quarters of 1998, Malhotra fraudulently directed three journal entries, without any support, which improperly reduced the amount of money that COHR had reserved as rebates owing to its customers. In fiscal 1997, Malhotra reduced this reserve account by $100,000, which resulted in a one percent increase in COHR's fiscal 1997 pre-tax income. Malhotra also directed an additional $100,000 reduction in the same account in the first fiscal quarter of 1998, and a $157,787 reduction in the

second quarter of fiscal 1998. These last two entries caused an improper four percent increase and a 7.5 percent increase in COHR's pre-tax income for its first and second 1998 fiscal quarters, respectively. COHR later restated these entries.

### Unsupported "Gross-ups"

16.    In fiscal 1997, Malhotra directed a series of journal entries that improperly increased both COHR's revenue and expenses in equal amounts, totaling $1,991,000, or two percent of COHR's revenue. None of these journal entries contained any documentary support or justification and all the entries were restated.

17.    Although these entries had no effect on COHR's pre-tax income because the entries increased both revenue and expenses by the same amount, they nevertheless gave the misleading impression that COHR's revenue was increasing more rapidly than was true. Since fiscal 1997 was COHR's first full year as a public company, it was important to COHR to show accelerating sales growth.

### Unsupported Rebate Reserve Reduction

18.    Malhotra directed several unsupported journal entries that reduced the Maintenance Master Plan ("MMP") rebate reserves accounts and thereby increased COHR's revenue. Under the MMP program, COHR repaired, serviced and maintained large medical equipment, such as CT scanners, for hospitals and other healthcare providers. The contracts between COHR and the healthcare providers contained a provision that entitled the healthcare providers to a rebate. The rebate represented a portion of the cost savings realized when the maintenance expenses incurred by COHR to service the equipment fell below a certain amount.

19.    At the end of the last quarter of fiscal 1997, Malhotra directed journal entries that decreased various rebate reserves, representing the amount to be rebated to the healthcare

providers, and correspondingly increased COHR's revenue by $694,975, or nine percent of COHR's 1997 pre-tax income. Subsequent improper journal entries reduced the rebate reserve by $535,228 in the first fiscal quarter of 1998 and by $623,676 in the second quarter of 1998. The result of these entries was to reduce the rebate balance to zero and improperly increase COHR's first 1998 fiscal quarter's pre-tax income by 20 percent and its second 1998 fiscal quarter's pre-tax income by 30 percent. In the restatement, the rebate reserves were reestablished.

### Fraud Regarding Equipment Sale to Yonkers

20. In its restatement, COHR restated seventeen equipment sales principally due to the premature recognition of revenue. The most egregious example involved the sale of equipment to Yonkers Hospital ("Yonkers").

21. In its third 1997 fiscal quarter, COHR received an order for MRI equipment from Yonkers. COHR estimated its cost at $375,000. In February 1997, COHR recorded the sale of MRI equipment to Yonkers as follows: revenue ($505,000) and cost of sale ($375,000). Both of these entries violated GAAP because this was a "bill and hold sale," meaning that the equipment was not delivered and title did not pass to the customer until COHR's second 1998 fiscal quarter.

22. Beginning on March 31, 1997, as part of the year-end closeout, Malhotra directed a series of entries that "eliminated" the $375,000 expense of acquiring the MRI equipment by improperly capitalizing the expense. This action resulted in the entire $505,000 being recorded as revenue with no expense in fiscal 1997. These entries overstated COHR's fiscal 1997 pre-tax income by $505,000, or six percent. In fiscal 1998, the $375,000 expense was amortized on a monthly basis for ten months ($37,222 per month). This amortization had the effect of minimizing its impact on COHR's pre-tax income. Malhotra was placed on administrative leave

because of this matter.

### Fraud Regarding Equipment Sale to United Financial

23. COHR billed its customer, United Financial of Illinois, Inc. ("United Financial"), for an equipment sale and recognized revenue for this sale, but mistakenly failed to include the sales tax in the bill to the customer. COHR corrected this error by rebilling United Financial for the entire amount including the sales tax. However, COHR failed to reverse the earlier incorrect invoice, thereby recording revenue for this sale twice in its books in fiscal 1997. The total overstatement of revenue for this sale was $146,511, or two percent of COHR's pre-tax income.

24. When Malhotra discovered that COHR had recognized revenue by double billing United Financial, instead of reversing the receivable immediately, he improperly amortized the overbilled amount over the subsequent three quarters of fiscal 1998.

### Malhotra's Misrepresentations To COHR's Auditors

25. In connection with the audit of COHR's financial statements for fiscal 1997, Malhotra falsely represented by his signature on a management representation letter dated May 30, 1997, to COHR's outside auditors, Deloitte & Touche, LLP, that COHR's financial statements were prepared in accordance with GAAP.

### CHOPRA'S VIOLATIONS

### Chopra's Knowledge of COHR's Financial Statements

26. Chopra was closely involved in the preparation of COHR's financial statements. Both he and Malhotra sat together at the end of each fiscal quarter and reviewed page-by-page COHR's general ledger. In addition, Chopra and Malhotra spent long hours side by side at work on COHR's financial statements at the end of each quarter. Furthermore, Chopra received and reviewed COHR's general ledger, balance sheet and income statement on a monthly basis.

27.     As COHR's CEO, Chopra was also acutely aware of analyst earnings targets and internal revenue and earnings targets. He knew that when COHR missed analyst expectations, its stock price declined. Chopra also closely followed COHR's stock price via a computer on his desk. In fact, Chopra's computer served no substantive function other than to display the company's stock price.

### Chopra Knew Or Was Reckless In Not Knowing That His Presidential Cost Center Contained Fraudulent Accounting Entries

28.     In order to keep track of costs, and for other internal accounting uses at COHR, the company allocated expenses to various "cost centers." On a monthly basis each person who had a cost center received a report that contained a break-out of accounting entries that were specific to their cost center. Chopra received and reviewed his presidential cost center report on a monthly basis.

29.     Many of the journal entries contained in Chopra's cost center reports were highly suspicious because they recorded revenue. The presidential cost center should typically not have any revenue. Rather, it should contain a record of expenses incurred by Chopra, such as staff salaries. The fact that significant revenue was recorded through his cost center should alone have been a "red flag" to Chopra that warranted, at a minimum, investigation by him. However, he undertook no investigation.

30.     Furthermore, many of the entries contained in Chopra's cost center were inherently suspicious because they were made by unsupported journal entries, were in round numbers, and were made at the end of a fiscal period. In fact, these entries, which are summarized below, are some of the same fraudulent entries made by Malhotra and then routed through Chopra's cost center.

- $700,000, recorded 3/31/97 (this is part of the unsupported "gross-up", see paragraph 17, *supra*);

- $694,975, recorded 3/31/97 (this corresponds with the unsupported rebate reserve reduction, see paragraph 19, *supra*);

- $100,000, recorded 3/31/97 (unsupported "Purchase Connection" entry, see paragraph 16, *supra*);

- $104,000, recorded 12/31/96 (unsupported HASC entry, see paragraph 14, *supra*);

- $50,000, recorded 12/31/96 (unsupported HASC entry);

- $80,000, recorded 9/30/96 (unsupported HASC entry); and

- $97,119, recorded 9/30/96 (unsupported HASC entry).

Based upon Chopra's accounting expertise, his deep understanding of, and familiarity with, COHR's accounting practices, the highly suspicious nature of these accounting entries, and his knowledge of them, Chopra knew or was reckless in not knowing that these entries contained in his presidential cost center violated GAAP. These entries, in total, overstated COHR's 1997 pre-tax income by $1,126,094 or 14 percent.

31. In connection with the audit of COHR's financial statements for fiscal 1997, Chopra falsely represented by his signature on a management representation letter dated May 30, 1997, to COHR's outside auditors, Deloitte & Touche, LLP, that COHR's financial statements were prepared in accordance with GAAP.

**Chopra Failed To Implement Proper Controls To Prevent
Premature Revenue Recognition from Equipment Sales**

32. In the first fiscal quarter of 1998, Chopra knew that COHR had prematurely recognized revenue on an equipment sale to a customer. Despite learning of this issue, Chopra recklessly failed to implement controls or take action sufficient to prevent the premature recognition of revenue for five more equipment sales that occurred after he knew of the earlier wrongdoing. Each of these five transactions was subsequently restated. In total, these

10

equipment sales improperly increased COHR's 1998 fiscal first quarter pre-tax profit by six percent and its 1998 second fiscal quarter pre-tax profit by eight percent.

### Unjust Enrichment of Chopra

33. On December 23, 1996, Chopra exercised options on 20,000 shares of COHR stock at $9 per share and sold all the shares on the same day at $20 per share, for a profit of $220,000. Chopra knew or was reckless in not knowing of the foregoing accounting irregularities and fraud at COHR at the time he sold the stock.

## VIOLATIONS BY DAVID MANIGAULT

### Fictitious Sale of Software To Blue Cross New Jersey

34. Manigault was responsible for the development, marketing, and sale of COHR 835 Direct software that was designed to assist in the processing of Medicare health insurance claims.

35. In March 1996, Manigault, on behalf of COHR, signed a distribution agreement with Blue Cross and Blue Shield of New Jersey, Inc. ("Blue Cross New Jersey"). The agreement gave Blue Cross New Jersey the right to distribute COHR 835 Direct software but did not obligate it to purchase the software. In fact, the agreement specified that a sale of the software would only take place if Blue Cross New Jersey sent an order with payment to COHR.

36. In May 1996, despite the terms of the distribution agreement, Manigault fraudulently directed an invoice be sent to Blue Cross New Jersey to sell 20 units of 835 Direct software. This invoice for $237,063 was sent to Blue Cross New Jersey even though it had not ordered any of the product. Relying on Manigault's assurances that this was collectible revenue, COHR recorded $237,063 as revenue in fiscal 1997.

37. In October 1996, Manigault fraudulently directed another invoice be sent to Blue

Cross New Jersey, even though it had ordered no product. The invoice included the previous bill for $237,063 as well as an additional bill for $99,816. COHR, again relying on Manigault's assurances that this was a valid invoice, recorded an additional $99,816 as revenue for fiscal 1997, for a total of $336,879 in revenue recorded in fiscal 1997. Because the development costs for the COHR 835 Direct software had already been expensed by COHR, this revenue generated a pre-tax profit for COHR of $336,879, or four percent of COHR's 1997 pre-tax income.

38. In a letter dated November 21, 1996, sent by Blue Cross New Jersey to Manigault, Blue Cross New Jersey told Manigault that it had neither ordered nor received any software from COHR and would not pay these invoices. Following this letter, COHR made no further attempts to collect this payment. Yet Manigault still falsely reassured COHR's accounting staff that this $336,879 was collectible, and he did not disclose to anyone at COHR at this time the November 1996 letter from Blue Cross New Jersey. Manigault also withheld the letter from COHR's auditors and all information regarding the true status of the collectability of this debt.

39. In late 1997, Manigault also falsely told COHR's credit manager that the Blue Cross receivable was collectible. To further conceal his fraud, he told her not to contact Blue Cross New Jersey about the receivable, and denied knowledge of the November 21, 1996 letter. COHR later obtained a copy of the letter from Blue Cross New Jersey. COHR reversed this entire revenue and wrote off the receivable as part of its restatement.

### Fraud in Connection With Blue Cross California Sales Contract

40. Under a contract that Manigault signed on behalf of COHR dated June 1, 1995, and amended on August 29, 1996, COHR provided license and distribution rights for its 835 Direct software to Blue Cross California ("Blue Cross California"). The contract stated that

Blue Cross California would pay COHR for the software upon COHR's installation of each individual unit, but Blue Cross California was obligated to pay COHR $2.8 million, the price for 240 units of software, on July 31, 1998, even if it did not request all 240 units.  Based upon this contract, COHR recorded $357,000 (or 1/8 of $2.8 million) as revenue each quarter.  Manigault told the accounting department that he was hand-delivering invoices for $357,000 to Blue Cross California each quarter.

41.     On two separate occasions Manigault fraudulently, and without any adequate basis, instructed COHR to record extra revenue in excess of the $357,000 recorded each quarter.  First, in September 1996, Manigault directed $95,224 be recorded as revenue in connection with an alleged "Six month Corporate Payment" by Blue Cross California.  Second, by a memorandum dated May 2, 1997, Manigault instructed COHR's finance department to recognize an additional $452,216 in revenue and $110,200 in expenses for fiscal 1997.  Manigault falsely claimed that COHR had distributed more than 468 copies of the 835 Direct software to health care providers under the Blue Cross California contract and provided activation keys to over 75 sites.  In fact, only eleven sites had the 835 Direct software delivered, installed, and customized by COHR so that it could work usefully.  Manigault's conduct led to COHR improperly recognizing $437,440 in pre-tax income for fiscal 1997, or five percent of its 1997 pre-tax income.

42.     In May 1997, Manigault signed a Directors and Officers questionnaire in which he falsely represented that he knew of no improper or inaccurate recording of payments or receipts at COHR

43.     COHR later discovered that: (1) apart from bills totaling approximately $350,000 for the less than 40 units of software that were actually installed, Manigault had never in fact

delivered any quarterly invoices to Blue Cross California; (2) Blue Cross California never received any bills from COHR for this software; and (3) Blue Cross California did not intend to pay COHR any additional amount under the contract.  COHR later wrote off the receivable allegedly owed by Blue Cross California.

44. Defendants Malhotra, Chopra, and Manigault knowingly or recklessly engaged in fraudulent and improper accounting practices, material misrepresentations, and material omissions of fact that led to COHR overstating its revenues and profits for fiscal 1997 and the first two quarters of fiscal 1998 in a departure from GAAP.

45. By reason of the foregoing, defendants Malhotra, Chopra, and Manigault violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of the
### Exchange Act and Rules 13b2-1 and 13b2-2 thereunder

46. Paragraphs 1 through 45 above are realleged and incorporated by reference herein.

47. By reason of the foregoing, Malhotra, Chopra, and Manigault violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] by knowingly circumventing, or knowingly failing to implement, a system of internal accounting controls at COHR, or knowingly falsifying the books, records, or accounts of COHR.  Malhotra, Chopra, and Manigault also violated Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1], by, directly or indirectly, falsifying or causing to be falsified, the books, records or accounts of COHR subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].  Furthermore,

Malhotra, Chopra, and Manigault violated Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2] by making, or causing to be made, materially false or misleading statements or omissions to an auditor.

### THIRD CLAIM FOR RELIEF

Aiding and Abetting COHR's Violations
of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the
Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder

48.     Paragraphs 1 through 47 above are realleged and incorporated by reference herein.

49.     In addition to the items described above, there are numerous improper accounting entries that COHR restated. These restated items included the delayed recognition of severance expense associated with two COHR employees and the underrecording of depreciation expense.

50.     As alleged more fully above, COHR filed with the Commission materially false and misleading financial statements for its fiscal 1997, and for the first two quarters of fiscal 1998, as part of its annual report on Form 10-K and quarterly reports on Form 10-Q, respectively.

51.     COHR also failed to make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflected the transactions and disposition of its assets. In addition, COHR failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles, or any other applicable criteria and to maintain accountability for assets. As a result of the foregoing, COHR violated Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 [17

C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] thereunder.

52.  Defendants Malhotra, Chopra, and Manigault knowingly provided substantial assistance to COHR in connection with its violation of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] thereunder.

53.  By reason of the foregoing, Defendants Malhotra, Chopra, and Manigault aided and abetted COHR's violation of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] thereunder.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

(i)  permanently enjoining defendant Malhotra, Chopra, and Manigault from, directly or indirectly, violating Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2] thereunder, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] thereunder;

(ii)  ordering defendant Chopra to pay disgorgement of profits, plus prejudgment interest;

(iii)  ordering defendants Malhotra, Chopra, and Manigault to pay a civil penalty

pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(iv)     entering an order under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting defendant Malhotra from acting as an officer or a director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § Section 78o(d)]; and

(v)     granting such other and further relief as this Court deems necessary and appropriate under the circumstances.

Dated: February __, 2003
       Washington, D.C.

　　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　Paul R. Berger (DC Bar No. 375526)
　　　　　　　　　　　　　　　　　　　　　　　　　Richard W. Grime (DC Bar No. 455550)
　　　　　　　　　　　　　　　　　　　　　　　　　Craig Welter
　　　　　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　　　　　　　　　　　Securities and Exchange Commission
　　　　　　　　　　　　　　　　　　　　　　　　　450 Fifth Street, N.W.
　　　　　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20549-0911
　　　　　　　　　　　　　　　　　　　　　　　　　202.942.4863 (Grime)

202.942.9637 (Fax)